**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **DORIS M. ARCHER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No: 09 C 4705** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Doris Archer, seeks review of the final decision of the Commissioner of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Ms. Archer asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.
### PROCEDURAL HISTORY

Ms. Archer applied for DIB and SSI on January 11, 2006, alleging that she had become disabled on September 29, 2005, due to pain in her shoulder, arm, hip, and leg, and memory problems. (Administrative Record ("R.") 142-43). Her application was denied initially and upon reconsideration. (R. 75-78, 81-93). Ms. Archer continued pursuit of her claim by filing a timely request for hearing.

An administrative law judge ("ALJ") convened a hearing on July 17, 2008, at which Ms. Archer, represented by counsel, appeared and testified. (R. 29-74). In addition, Michelle Peters testified as a vocational expert. (R. 29, 62-72). On December 2, 2008, the ALJ issued a decision finding that Ms. Archer was not disabled because she retained the capacity to perform jobs that exist in significant numbers in the national economy. (R. 14-28). This became the final decision of the Commissioner when the Appeals Council denied Ms. Archer's request for review of the decision on June 3, 2009. (R. 1-3). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Archer has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Ms. Archer was born on March 23, 1972, making her thirty-six years old at the time of the ALJ's decision. (R. 154). She only went to school until ninth grade, and took special education classes throughout. (R. 34-35, 172). She can read and write "a little." (R. 35). She doesn't have much of a work history at all: one job, as a waitress, from 2002 to 2005. (R. 158).

### B.

### Medical Evidence

The medical record in this case is a 350-page jumble of documents in no particular order. It appears to span a time period from 1998 through 2008, but the vast majority of medical evidence pertains to 2003 through 2008. Ms. Archer points to a relatively small percentage of these documents, however, as supporting her claim of disability. They cover memory

deficiencies, hearing loss, and pain in her hands, back, neck, and arm. (*Plaintiff's Memorandum in support of Summary Judgment*, at 6-13).

## 1.
## Memory Impairment

Throughout the period covered by the record, Ms. Archer complained of memory problems to physicians on very few occasions. She appears to have mentioned it on a visit to her local health center on September 13, 2005, although the notes from the visit are in an illegible scrawl. (R. 272). She also mentioned in on January 11, 2000 (R. 327) and October 19, 2006 (R. 441).

Psychologist Alan Jacobs characterized Ms. Archer's long-term and short-term memory to be "mild to moderately impaired" when he evaluated her in March 2006, at the request of the Agency. (R. 355). When Dr. Stanley Rabinowitz performed a mental status examination the Agency arranged in April 2006, he found Ms. Archer's "memory was intact." (R. 350). Ms. Archer had a neurological examination with Dr. Cho in August 2006, at which time she reported her memory had worsened in the prior year and a half. (R. 424). Dr. Cho stated that his review of symptoms was "negative" for memory loss (R. 425), but there was also a reference to a "[c]hronic memory impairment [that] may be a manifestation of dementia or sequela of meningitis or daily opiod [sic] use." (R. 427). A report from Ingalls Hospital dated January 19, 2008, states that her memory was normal. (R. 523).

Ms. Archer also complained to her social worker, Michelle Gervais, about her "forgetfulness" on October 26, 2006. (R. 408). On August 28, 2006, Ms. Gervais characterized Ms. Archer's immediate recall, recent memory, and remote memory as "marked[ly]" impaired. (R. 592). In a work setting, however, Ms. Gervais said that Ms. Archer's ability to understand

and remember very short and simple instructions was "not significantly limited." (R. 410).  Her ability to understand and remember detailed instructions was also "not significantly limited." (R. 410).  Her ability to remember locations and work-like procedures was "moderately limited." (R. 410).  Oddly, Ms. Gervais also reported that Ms. Archer's recent and remote memory was markedly impaired. (R. 592).

In June of 2007, Ms. Gervais opined that Ms. Archer had a bipolar disorder and reported that Ms. Archer's condition was "unchanged' since her previous report. (R. 408).  But she found Ms. Archer was now markedly limited in the ability to perform activities on schedule, sustain a routine, work without being distracted by others, make simple work-related decisions, complete a work week without interruptions, and get along with co-workers. (R. 410-11).

**2.**
**Hearing Loss**

Ms. Archer also alleges hearing loss in her right ear.  Dr. Rabinowitz found her hearing to be "moderately impaired with the spoken voice heard at four feet." (R. 349).  She didn't use a hearing aid and "speech and communication were intact." (R. 349).  Dr. Cho reported that Ms. Archer had lost her hearing in her right ear at the age of four months due to meningitis. (R. 425).  So it has been a life-long condition.

**3.**
**Pain and Numbness in Hands**

A note from the clinic mentioned that Ms. Archer "states it's hard for her things [sic] with both hands due to both wrists" and  "parathesias [sic] both hands." (R. 331).  There was another mention of right hand pain in June 2006. (R. 382).  When Dr. Rabinowitz performed his

consultative examination in April 2006, he found Ms. Archer to have normal grip strength and dexterity. (R. 351).

During her neurological examination with Dr. Cho in August 2006, Ms. Archer complained of pain that "occasionally radiates down into both hands but the pain is largely in her [left] shoulder." (R. 424). She also said that "[s]he would sometimes drop things in both hands if the pain was severe." (R. 424). Ms. Archer's grip strength was 5/5 bilaterally. (R. 427). Wrist flexion and extension were normal. (R. 427). Sensation was also normal. (R. 427).

On November 28, 2007, Ms. Archer reported to Dr. Lisa Peng at the pain management clinic that she had "occasional numbness and tingling in her bilateral hands [sic] . . . ." (R. 467). A note from the University of Illinois Medical Center states that Ms. Archer complained of daily episodes of bilateral hand numbness" on April 23, 2008. (R. 572). Motor strength was normal bilaterally, and sensation to light touch was intact bilaterally in her hands. (R. 572). She said she had "difficulty grasping objects in her hands 2/2 pain" on June 23, 2008. (R. 566). Those were the only two mentions of hand difficulties during several visits over a three-month period however. (R. 562-580).

## 4.
## Back and Neck Pain

Far more consistent were Ms. Archer complaints about her back, neck, and shoulder pain. She sought treatment for these problems regularly over the year the record covers:

9/15/99 – back pain (R. 331)

1/11/00 – left arm pain (R. 327)

6/13/02 – shoulder pain (R. 324)

3/13/03 – left shoulder pain (R. 323)

5

5/22/03 – pain syndrome (R. 321)

9/13/05 – [right] shoulder progressive over 2 years" (R. 272)

10/2/2005 – bilateral shoulders, neck and shoulder girdle (R. 313)

10/3/05 – bilateral shoulder pain (R. 271).

4/5/06 –  pain in the knees, hips, shoulders, low back, and neck (R. 348)

7/6/06 – back and neck pain (R. 438)

8/3/06  – pain in arms, greater on left; rated it 10/10 every day(R. 432)

8/14/06 –  neck pain (R. 439)

10/19/06 – left arm pain (R. 441)

11/16/2006 – shoulder pain (R. 420)

11/26/06 – neck pain (R.442)

12/07/2006 – bilateral arm, neck, and shoulder pain (R. 417)

12/21/06 – shoulder pain (R. 443)

1/29/07 –  bilateral shoulder pain (R. 446)

5/31/07 –  left arm pain(R. 449)

7/13/07 – shoulder and back pain relieved with medication (R. 451)

8/27/07 – shoulder and neck pain(R. 473)

11/28/07 – intermittent pain in neck, shoulders, arms, relieved with medication (R. 467)

11/29/07– back and neck pain (R. 482)

1/7/08 – back, neck, and shoulder pain (R. 483)

3/23/08 and 4/23/08 – pain in neck radiating down arms, constantly achy but intermittently sharp; 10/10 when not taking medication, Kadian brought it to an acceptable level, 4-5/10 (R. 572, 574)

There is also a fair amount of objective medical evidence covering these problems. An x-ray of Ms. Archer's left shoulder was normal on March 27, 2003. (R. 334). On October 10, 2005, Dr. Jacob Manual noted that Ms. Archer had a good range of motion in her shoulders and neck. (R. 434). There was tenderness in her shoulders. (R. 434). Strength and sensation were normal. (R. 434).

In April 2006, during his consultative examination, Dr. Rabinowitz found Ms. Archer's range of motion was normal throughout the back and in all joints of the arms and legs, although there was crepitus in Ms. Archer's knees (R. 350). Straight leg raising was negative in the seated and supine positions. (R. 351). Reflexes and motor strength were normal (R. 350). The consulting psychologist, Dr. Alan Jacobs, said on May 17, 2006, that he thought Ms. Archer's problems might be due to somatoform disorder and histrionic personality disorder. (R. 355).

On August 3, 2006, an MRI of Ms. Archer's cervical spine revealed disc bulging at C5-C6 and C6-C7, but no central canal or foraminal stenosis. (R. 424). There was weakness in her triceps and biceps, and diminished sensation, and this was more pronounced in her left arm. (R. 432). Reflexes were normal. (R. 432). Ms. Archer's range of motion in her neck was decreased due to pain. (R. 433). On August 10, 2007, Ms. Archer had a cervical epidural steroid injection. (R. 553).

On November 17, 2006, Dr. Englehard reported that Ms. Archer exhibit weakness in her triceps and biceps, more on the left, and numbness predominantly in the C7 dermatome. (R.

422).[1]  A CT of Ms. Archer's cervical spine revealed multilevel mild degenerative disc disease with no evidence of foraminal stenosis.  (R. 420).

Dr. Lisa Peng examined Ms. Archer on August 27, 2007, and reported that she was in no distress, and had normal sensation, reflexes and muscle strength.  (R. 473).  The examination was much the same on September 27, 2007: no distress, and a full range of motion in all joints. (R. 476).

A report from Ingalls Hospital on January 19, 2008, states that Ms. Archer had a normal range of motion in her upper and lower extremities and back.  (R. 523).  On May 27, 2008, an MRI of Ms. Archer's lumber spine revealed a degenerated disc at L5-6 with a partial annular tear and generalized bulge.  (R. 566).  There was no central canal or neural foraminal compromise. (R. 566).

Ms. Archer had a lumbar epidural on July 8, 2008.  She complained that she had some type of allergic reaction with heartburn and coughing, but it was relieved will pediatric benadryl. (R. 565).  Dr. Charles Laurito saw Ms. Archer on July 22, 2008, and noted that any allergic reaction to an epidural injection would be rare.  (R. 562).  Ms. Archer refused further injections, however,  in favor of continued medications.  (R. 562).  There was mild tenderness along her cervical and lumbar spine, but motor strength was normal in all extremities.  (R. 562).

---

[1] Each of the spinal nerves exits the spinal canal between two of the vertebra. Each then goes to a particular area of the body. The area of skin served by each of these nerves is called its dermatome. The C7 dermatome is variously said top affect the middle finger, http://www.neurosurgical.com/neuro_medical_info/neuro_exam.htm; http://www.merck.com/mmhe/sec06/ch093/ch093a.html

On September 8, 2008, Ms. Archer had an EMG to assess the nerve distributions from the C5 through C8 levels of her cervical spine. (R. 611). Dr. Englehard felt there was significant evidence of "bilateral C7 . . . dermatomal conduction delay. . . ." (R. 611).

## C.
### Administrative Hearing Testimony

### 1.
### Plaintiff's Testimony

At the hearing, Ms. Archer testified that she lives with her three children, ages 14 to 16. (R. 33). She's right-handed. (R. 33). At the beginning of the hearing, she allowed that had a license and drives (R. 33), but later she denied that she drove at all. (R. 58). She quit high school after ninth grade – she was taking special education classes – and said she was able to read and write a little. (R. 35). At her last job, she was a waitress and cooked as well. (R. 36). She stopped working in September of 2005. (R. 36).

Ms. Archer stated that she dropped things, hurt all over, and couldn't sit or walk for very long. (R. 36). She forgot orders. (R. 36). She forgot doctors' appointments. (R. 38). She said her lower back hurt since she was 15. (R. 37). The pain lasts for hours every day. (R. 42). A warm bath or medication relieved it "somewhat." (R. 43). She said she was told that there was only a 50% chance that surgery would help. (R. 47). She thought she could sit for about a half hour and walk for a block before she had to rest. (R. 51). It hurt when she reached overhead. (R. 51). She was able to manipulate buttons and zippers, but had trouble opening jars. (R. 52). She claimed to have swelling in her legs. (R. 53). She had trouble sleeping due to pain. (R. 56). Her children did all the housework. (R. 55). They did the shopping as well, because Ms. Archer

rarely left the house. (R. 57). She used to like to shop, but never went anymore. (R. 57-58).[2]

She never visited friends, but did talk with them on the phone. (R. 58). Basically, all she did

was stay in her room and watch TV. (R. 58-59).[3]

Ms. Archer said she had no problem getting along with people; not her bosses and co-

workers when she worked and not her friends now. (R. 54). She said she had a hearing

problem that affected both ears, but one she couldn't hear out of at all. (R. 60).

## 2.
## Vocational Expert's Testimony

Michelle Peters then testified as a vocational expert. She classified Ms. Archer's

cook/waitress job as ranging between semiskilled, light work for the waitressing and medium,

skilled worked for the cooking. (R. 65). In response to the ALJ's hypotheticals, the VE testified

that if a person were limited to medium, simple work, she would not be capable of performing

the cooking job. (R. 66). A limitation to simple tasks would also not allow for a full range of

medium work, because some jobs required a higher skill level. (R. 66). But, such a person

could perform janitorial work (5000 positions in the region) and certain assembly jobs (4000)

and packaging jobs (3500). (R. 67). If the exertional level were further reduced to light work,

there would still be a significant number of janitorial jobs (2800), assembly work (2000), and

hand-packaging jobs (1900). (R. 68). Assembly and hand-packaging would allow for a sit-stand

---

[2] It should be noted that in June of 2006, Ms. Archer's friend of ten years reported that she saw Ms. Archer three hours a day, took her shopping, and cooked for her. (R. 217). Shopping was done once a month. (R. 220). She also took her to doctors' appointments because she was afraid to go by herself. (R. 219).

[3] The medical record indicates that Ms. Archer traveled to Mexico at the end of 2007 and the beginning of 2008. (R. 482 ("has appt for neuro 1/5/06 - need to resched (will be in Mexico))"). The ALJ referred to this point in her opinion (R. 17, 22), but did not question Ms. Archer about it at the administrative hearing.

option.  (R. 68).  If pain cased the individual to be off task more than 20% of the time, she would not be able to sustain employment.  (R. 70).

A further limitation to only occasional handling of objects would preclude all light, unskilled work.  (R. 70-71).  If the limitation were to frequent, as opposed to constant, handling, the light, unskilled job base – sit-stand option or not – would be reduced by 75%.  (R. 72).

### D.
### ALJ's Decision

The ALJ found that Ms. Archer suffered from the following "severe combination of impairments: degenerative disc disease of the cervical and lumber spine, diabetes, fibromyalgia, obesity, somatoform disorder, and bipolar disorder.  (R. 16).  She further found that these impairments did not meet or equal a listed impairment, specifically listing 1.04, covering disorders of the spine, 12.04, covering affective disorders, and 12.07, covering somatoform disorders.  (R. 17).

Next, after summarizing the evidence in the medical record and discussing Ms. Archer's testimony, the ALJ determined that she could perform light work as long as it was limited to simple, repetitive tasks.  (R. 18).  Under the regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§ 404.1567(b); 416.967(b).  She found that Ms. Archer was not entirely credible as to the extent of the restrictions resulting from her impairments.  (R. R. 25).  Ms. Archer could not perform her past work, however, which ranged from semiskilled to skilled and from light to medium.  (R. 26).  The ALJ then relied on the VE's

testimony to find that Ms. Archer could perform jobs existing in significant numbers in the regional economy. (R. 27-28). As a result, he concluded that Ms. Archer was not disabled. (R. 28).

**IV.**
**DISCUSSION**

**A.**
**Standard of Review**

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every

piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It's also called a "lax" standard, *Berger*, 516 F.3d at 544.

## B.
## Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof

through step four; if it is met, the burden shifts to the Commissioner at step five.  *Briscoe*, 425

F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

### C.
### Analysis

Ms. Archer submits that there are a few flaws in the ALJ's decision.  First, she complains

that the ALJ failed to adequately consider her memory problems, hearing loss,  and limitations in

using her hands in her residual functional capacity ("RFC") determination.  She also argues that

the ALJ failed to take her somatoform and bipolar disorders into account.  Then, she says the

ALJ ignored portions of the VE's testimony.   She also contends the ALJ improperly rejecting

the opinion of her social worker.  Finally, she chastises the ALJ for not having had a medical

expert review some evidence that came in after the hearing.

### 1.
### The ALJ Adequately Analyzed and Accounted for Ms. Archer's Impairments

### a.

Ms. Archer complains that the ALJ ignored her memory problems in determining her

RFC.  She points to her testimony and her complaints to physicians and her social worker.  But

when doctors assessed her memory, however, their characterizations of it ranged from "intact"

(R. 350) or "normal" (R. 523) to "mild to moderately impaired." (R. 355).  Ms. Archer's social

worker said that, in a work setting,  Ms. Archer was "not significantly limited" in her ability to

understand and remember, not only very short and simple instructions, but detailed instructions

as well.  (R. 410).  Her ability to remember locations and  work-like procedures was "moderately

limited."  (R. 410).  At another point in the record, the social worker contradicted herself and

also said that Ms. Archer's recent and remote memory was markedly impaired.  (R. 592).

So, at worst, Ms. Archer's memory was said to be mildly or moderately impaired, while the general consensus appears to be that Ms. Archer's memory was "intact," "normal," or "not significantly limited." That's also how the ALJ saw it, and it was up to her to weigh these medical assessments and reach a decision regarding the effects of Ms. Archer's memory loss on her ability to work. *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005); *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir.2004).

Ms. Archer's brief ignores these rather benign findings and their import. And that renders its reliance on *Stewart v. Astrue*, 561 F.3d 679 (7th Cir. 2009) and *Kasarsky v. Barnhart*, 335 F.3d 539 (7th Cir. 2002), where the limitations far exceeded the foregoing, misplaced. It also relied on *Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008), where the court found "there [was] not an 'accurate and logical bridge' between the ALJ's recitation of the mental medical evidence and the decision to account for [claimant's] mental impairments by limiting him to unskilled work." 539 F.3d at 677-78. But the ALJ did not simply limit Ms. Archer to "unskilled work"; she limited her to unskilled work that involved only simple tasks. As the ALJ went through a series of hypotheticals with the VE, the VE pointed out that there was a difference: "[n]ot all unskilled work is simple tasks." (R. 67). So actually, the ALJ limited Ms. Archer to a much smaller subset of unskilled work, and employed this in her hypotheticals to the VE, thereby accounting for her limitations in a way that was not done in *Craft*. Notably, this tack does not run afoul of SSR 85-15, which stated that:

> Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an *unskilled job* as difficult as an objectively more demanding job.

1985 WL 56857, *6 (emphasis supplied). Again, the ALJ didn't simply limit Ms. Archer to unskilled work, but to unskilled work involving only simple tasks, a more severe restriction according to the VE.

Other Seventh Circuit decisions lend support to the ALJ's determination. In *Sims v. Barnhart*, 309 F.3d 424 (7th Cir. 2002), there was medical evidence that the claimant suffered from organic brain damage, as well as depression and agoraphobia, that resulted in mild to moderate limitations in several areas of functioning, including maintaining concentration, persistence, and pace. 309 F.3d at 431. The Seventh Circuit had no problem with the ALJ translating these limitations into a restriction to work not involving complex tasks or unusual stress levels. 309 F.3d at 431-32. In a similar vein, the court in *Johannsen v. Barnhart*, 314 F.3d 283 (7th Cir. 2002) found it appropriate for the ALJ to accommodate the claimant's moderate limitations in the ability to maintain a regular schedule and attendance and complete a normal workday and workweek by limiting him to simple, repetitive work. 314 F.3d at 288-89. More recently, in *Simila v. Astrue*, 573 F.3d 503 (7th Cir. 2009), the court determined that an ALJ adequately accounted for a clamant's moderate difficulties with concentration, persistence, and pace by limiting him to unskilled light work. 573 F.3d at 521-22.[4]

---

[4] It's not surprising that the parties are unable to harmonize cases like *Stewart*, an EAJA case where the court stated that "[t]he Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to 'simple' tasks, and we and our sister courts continue to reject the Commissioner's position." 561 F.3d at 685, with cases like *Simila*, where the court stated that "[w]e have held that claimants who 'often experience[ ] deficiencies of concentration, persistence, or pace' are capable of performing semiskilled work, *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir.2003), and those who are 'mildly to moderately limited in these areas,' are able to perform 'simple and repetitive light work,' *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir.2002)." 573 F.3d at 521-22. The Seventh Circuit has acknowledged, albeit in a unreported decision, that, given its "countervailing" decisions on the subject, "there is uncertainty in the law regarding the formulation of hypothetical questions accounting for mental limitations." *Kusilek v. Barnhart*, 175

(continued...)

Ms. Archer also raises perhaps the most common argument among claimants hoping to overturn an ALJ's decision: that the ALJ failed to build an adequate "logical bridge" between the evidence and her conclusion. She tacitly admits that there was substantial evidence in the record to support the ALJ's conclusion, but argues that was not enough because the ALJ failed to analyze the evidence as thoroughly as she would have liked. (*Plaintiff's Reply*, at 2). But the ALJ discussed all the evidence related to Ms. Archer's memory problems – and she didn't even have to go that far. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (ALJ need not mention every piece of evidence). The medical findings, as already noted, were, in the main, rather benign. The most dire assessment was a mild to moderate restriction. Based on that, the ALJ felt that Ms. Archer was moderately limited in the area of maintaining concentration, persistence, and pace. (R. 18). As a result, she would be limited to work involving simple tasks. The only assessment suggesting that Ms. Archer couldn't perform simple tasks due to her memory problems was embedded in the findings of her social worker who, as already noted, also contradicted herself by finding the opposite. But more on Ms. Gervais later.

It's unclear what more Ms. Archer would have wanted, because as is usually the case when this argument is raised, it is done so in a conclusory fashion without illumination. But all that is necessary is for the reviewing court to follow the path of the ALJ's reasoning and be able to perform a meaningful review, and that's easily done here. *See Schmidt v. Astrue*, 496 F.3d 833, 843-44 (7th Cir. 2007)(ALJ's reasoning adequate to allow review where decision discussed medical evidence that led to conclusion); *Diaz v. Chater,* 55 F.3d 300, 308 (7th Cir. 1995)(same).

---

[4](...continued)
    Fed.Appx. 68, 71, 2006 WL 925033, *3 (7th Cir. 2006).

Simply put, it is not at all difficult to follow the line of reasoning from evidence demonstrating a memory impairment ranging from non-existent to mild to moderate at worst, to a moderate affect on concentration, and finally to a limitation to simple tasks.

**b.**

Next, Ms. Archer raises the issue of her hearing loss, and argues that the ALJ ought to have factored it into her RFC determination. But the evidence regarding her hearing loss indicated it was confined to one ear, and had been a life-long condition that Ms. Archer had been able to work in spite of in the past. She did not require a hearing aid. The condition left her with moderately impaired hearing, but her speech and communication were intact. The ALJ mentioned all this in determining that the impairment did not result in a restriction on Ms. Archer's ability to perform simple, light work. (R. 25).

Ms. Archer focuses on the ALJ's mention of her working in the past despite her hearing loss, ignoring the fact that the ALJ also found that her ability to communicate was intact. Setting that aside, it is true that, in *Henderson v. Barnhart*, 349 F.3d 434 (7th Cir. 2003), the Seventh Circuit said that "the fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer or be working beyond his capacity out of desperation." 349 F.3d at 435. The court found that the claimant in that case, who had a very low IQ, was unfit to drive a school bus because it was a responsible position, despite the fact that he had been allowed to do so in the past. There's nothing like that in play here; Ms. Archer was a waitress and a cook. She never alleged that her hearing had any impact on her ability to take orders from customers or follow instructions in the kitchen. And according to the Dictionary of

Occupational Titles ("DOT"), hearing is a significant aptitude for a short-order cook – it's required "frequently" despite a "moderate" noise level.  DOT 313.374-014.

In her reply brief, Ms. Archer submits that jobs like inspector, hand packager, and packer are said to have a high noise level, citing the DOT.  (*Plaintiff's Reply*, at 2).  But so what?  The DOT listing for inspector and hand packager – the very one Ms. Archer cites in her brief – indicates that hearing is not required.  DOT 559.687-074 ("Hearing: Not Present - Activity or condition does not exist").  The same is true of the packing job Ms. Archer cites.  DOT 920.687-130.  So, presumably, a person who was totally deaf could perform the types of jobs the ALJ found Ms. Archer capable of, and Ms. Archer is far from totally deaf.

<b>c.</b>

Ms. Archer's next complaint is that the ALJ failed to adequately consider the evidence relating to her problems using her hands.  But, again, the ALJ discussed the relevant evidence.  There was no doubt that Ms. Archer had some nerve root involvement at C7, and this *could* affect one or two middle fingers of the hand.  But the question for the ALJ was whether, and to what extent, it *did* – in other words, did this impairment adversely impacted Ms. Archer's RFC.

The fact that Ms. Archer complained to physicians about her hands does not alone prove that she has limited use of them.  "Applicants for disability benefits have an incentive to exaggerate their symptoms . . . ."  *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).  Although an ALJ may not simply disregard a claimant's subjective complaints of pain, he may view discrepancies with the medical record as probative of exaggeration. *Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir.2008); *Johnson*, 449 F.3d at 805; *Sienkiewicz v. Barnhart,* 409 F.3d 798,

804 (7th Cir.2005).  That's what the ALJ did here, and she was not out of line in doing so.  Three different physicians followed up on Ms. Archer's complaints about her grip and loss of feeling in her hands.  Each time, her grip strength and sensation were found to be normal.  The ALJ relied on these medical assessments of Ms. Archer's ability to use her hands – the only ones in the record – to find she was not significantly limited.[5]

#### d.

Ms. Archer also points out that the record includes diagnoses of somatoform disorder and bipolar disorder, and argues that the ALJ failed to include limitations stemming from these impairments in her RFC.  But a diagnosis is not necessarily a disability.  *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005).  "The social security disability benefits program is not concerned with health as such, but rather with ability to engage in full-time gainful employment. A person can [have various mental and physical impairments] yet still perform full-time work."  *Gentle*, 430 F.3d at 868.  The ALJ specifically discussed the limitations stemming from Ms. Archer's mental impairments.  (R. 17).  In so doing, she said she was merely giving the "benefit of the doubt" regarding the social worker's "diagnosis" – so-called, not coming from an acceptable medical source, *see* 20 C.F.R. §§ 404.1513(a); 416.913(a) – of a bipolar disorder.

She made a similar allowance for Ms. Archer's somatoform disorder, which was also a questionable diagnosis.  Ms. Archer told Dr. Jacobs that physicians had found no cause of her neck, shoulder and back pain and that they had referred her to a psychiatrist.  (R. 354). Dr.

---

[5] The fact that three different doctors all reached the same conclusions when evaluating Ms. Archer's hand impairment over the period of 2006 through 2008, and these conclusions are uncontradicted, completely undermines Ms. Archer's assertion in her reply brief that the ALJ failed to develop the record.  The ALJ had sufficient evidence to allow her to reach a decision on this point.  *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009).

Jacobs thought Ms. Archer's problems with pain might be due to somatoform disorder. (R. 355). Somatoform disorder "is a chronic, severe disorder characterized by many recurring physical symptoms that cannot be fully explained by a physical disorder." http://www.merck.com/mmhe/sec07/ch099/ch099e.html. Of course, this was in May of 2006. Thereafter, doctors were able to trace Ms. Archer's pain to bulging discs in her neck and lower back through CT scans and MRIs. The first of these tests was not performed until August of 2006. So the diagnosis may not be relevant after that point but, in any event, the ALJ did not ignore Ms. Archer's pain, whatever its source, which she discussed at length and found that it limited her to light work. (R. 20-25). An ALJ may account for the limitations from an impairment like somatoform disorder in her assessment of a claimant's pain and the limitations she finds stem from it. *See Simila v. Astrue*, 573 F.3d 503, 521-22 (7th Cir. 2009). While a claimant is not disentitled to benefits is the source of her pain is purely psychological – as Ms. Archer argues, citing *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (*Plaintiff's Memorandum*, at 12) – neither does a diagnosis of somatoform disorder preclude an ALJ from finding that a claimant can still perform light work. *Simila*, 573 F.3d at 503, 515 (7th Cir. 2009).

In determining that Ms. Archer's complaints of limitations due to pain were only credible to an extent, the ALJ specifically stated that she considered the factors required by the regulations and SSRs 96-4p and 96-7p. She went into further detail regarding certain of these factors. She said the objective medical evidence did not support the full range of limitations Ms. Archer alleged. (R. 19). Range of motion and strength in joints was almost invariably reported as good or normal (R. 434, 350, 473, 476, 523), with the exception of one occasion when the range of motion in Ms. Archer's neck was limited by pain (R. 437), and two occasions where

weakness and diminished sensation were noted in her triceps and biceps  (R. 422, 432).  As for her hands, as detailed earlier, grip strength and sensation were invariably normal.  These are all valid bases for rejecting the extent of a claimant's complaints.  *See Simila*,  573 F.3d at 518 (normal range of motion and strength findings belie complaints of disabling pain);  *Getch,* 539 F.3d at 483; *Johnson*, 449 F.3d at 805; *Sienkiewicz,* 409 F.3d at 804.[6]

The ALJ also referenced Ms. Archer's course of treatment which, aside from two injections, was confined to painkillers.  *Simila*, 573 F.3d at 519 (relatively conservative treatment of pain medications, several injections, and one physical therapy inconsistent with complaints of disabling pain).  The ALJ also found inconsistencies in Ms. Archer's testimony that undermined her credibility.  She testified she didn't leave the house and did very little, yet she traveled to Mexico in the winter of 2006-2007.  (R. 17, 25); *see* footnote 3, *supra*.  She said she never saw any friends, but her friend submitted a statement that she saw her every day for three hours.  *See* footnote 2, *supra.*  Given the minefield that ALJs face when, as the regulations and rulings require, they consider a claimant's activities when assessing credibility, *see Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004), it is important to note that the ALJ did not indicate that travel to a foreign country is commensurate with an ability to work.  It is, however, inconsistent with a claim that one does nothing and doesn't leave the house.  Just as saying one never sees any friends is inconsistent with a friend's statement that she visits every

---

[6] While somatoform disorder may lead to an exaggeration of pain symptoms, physicians can often determine the difference, as the court explained in *Simila*, which was also a somatoform disorder case.  573 F.3d at 518-19.  And here, for instance, there was just a single report that range of motion or strength studies elicited pain.

day for three hours.  Overall, the ALJ gave plenty of support for her finding that Ms. Archer's

testimony was not entirely credible.[7]

## 2.

### The ALJ Did Not Improperly Ignore VE Testimony

Ms. Archer contends that the ALJ ignored the VE's testimony that if a person were off

task for 20% all employment would be precluded.  She claims the ALJ elicited the testimony

(*Plaintiff's Memorandum*, at 7), but that's not true – her attorney did.  (R. 69).  But there is no

source for the attorney's 20% figure anywhere in the record.  He apparently arrived at it during

the following exchange with the VE:

> ATTY: . . . let's, first of all, talk about what's the expected on-task performance in these unskilled jobs that we've described at the light and medium level.
>
> VE: Unskilled positions in competitive employment are requiring an individual to work . . . at least at 82 percent of the workday.
>
> *              *              *
>
> ATTY: Right.  Well, then I want you to assume that, you know, because of the pain the Claimant would essentially be off task more than 20 percent, would that have an effect.

(R. 70).  Predictably, after just having said that a worker would have to be on task 82% of the

time, the VE responded that the claimant would be unable to maintain employment.  (R. 70).

---

[7] Ms. Archer also says that the ALJ failed to consider limitations stemming from her obesity.  The ALJ did consider Ms. Archer's obesity as SSR 02-1p directed, however, and determined that it did not cause greater limitations than set forth in her RFC finding.  (R. 16).  Even where an ALJ does not address the impact of obesity, it is harmless error when the ALJ relies on the record for her RFC finding, *Prochaska v. Barnhart*, 454 F.3d 731, 736-38 (7th Cir.2006), and the ALJ went further than that here.  Moreover, Ms. Archer did not articulate how her obesity affected her symptoms, nor was this indicated by any physician.  *See Prochaska*, 454 F.3d at 737 (claimant did not specify how obesity further impaired her ability to work and pointed to no evidence in the record that demonstrated it did).

The whole thing is more than a bit contrived. The attorney essentially says, "tell me something that would preclude all employment for my client." And then, having discovered what that would be, follows up by saying, "okay, assume that she has that, can she work?"

The important thing, however, is there is no evidence that Ms. Archer would be off task 20% of the time. No physician, of the many who either examined or treated her, indicated she would. This wasn't the ALJ's hypothetical, but an ALJ need only include the limitations that are supported by medical evidence in the record" in a hypothetical. *Simila,* 573 F.3d at 520; *Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir.2002); *see also Schmidt*, 496 F.3d at 846 ("ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible."). Accordingly, the ALJ did not improperly ignore the testimony elicited by Ms. Archer's attorney.

### 3.
### The ALJ Did Not Improperly Reject The Social Worker's Report

The ALJ adequately gave her reasons for rejecting the social worker's assessment by noting it was not from an acceptable medical source, *see* 20 C.F.R. §§ 404.1513(a); 416.913(a)(listing only sources that can provide evidence to establish a medical impairment – social worker not among them), was based on a short relationship, *see Sanchez v. Barnhart*, 467 F.3d 1081, 1084 (7th Cir. 2006)(value of "longitudinal picture" of an impairment), contradicted other evidence in the record, *Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009)(ALJ is not required or indeed permitted to accept medical evidence if it is refuted by other evidence); *Liskowitz v. Astrue*, 559 F.3d 736, 742 (7th Cir. 2009)(ALJ may properly reject finding that is inconsistent with other medical evidence in the record), and wasn't supported by her clinical

notes. *Simila*, 573 F.3d at 515 (ALJ properly rejected psychiatrist's report regarding claimant's limitations where note provided not support for findings and limitations appeared to be based solely on claimant's complaints); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008)(ALJ may properly reject finding that is internally inconsistent or based solely on claimant's complaints). Ms. Archer's brief (*Plaintiff's Memorandum,* at 9-10) ignores the fact that the ALJ's rationale went beyond the fact that Ms. Gervais was a social worker and not a doctor. Also, Ms. Archer's reference to SSR 06-3p is of little value because, as the ALJ pointed out (R. 26), Ms. Gervais's "treatment" of Ms. Archer – according to Ms. Gervais's notes (R. 599-603) focused almost entirely on Ms. Archer's parenting skills, with no discussion of memory problems beyond mentioning Ms. Archer's complaints. Thus, Ms. Gervais has not "provided better supporting evidence and a better explanation for . . . her opinion" than the medical sources. *See* SSR 06-3p, *5.

**4.**

**The EMG Results Did Not Necessitate Obtaining Expert Medical Opinion**

Finally, Ms. Archer says the ALJ had to have a medical expert review the EMG from September 2008 that revealed "bilateral C7 . . . dermatomal conduction delay. . . ." (R. 611). This was not a new finding; it had been diagnosed in 2006. (R. 422). As already noted, this can affect the middle finger, or middle two fingers. Under SSR 96-6p, which Ms. Archer relies upon, an ALJ has to obtain an updated medical opinion on equivalence to a listed impairment "[w]hen additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's

finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." 1996 WL 374180, *4. Here the ALJ specifically assessed the EMG and clearly found it would not change such a finding. As she noted, time and again in the record, Ms. Archer's grip strength and sensation were assessed as normal. (R. 24). So there was no evidence that the condition resulted in an inability to work. Again, there is a difference between a condition and a disability.

## CONCLUSION

The plaintiff's motion for summary judgment or remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 2/22/11